Charles M. Walker
U.S. Bankruptcy Judge
Dated: 1/10/2020



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No: 3:18-bk-04294 |
| Jessica Nicole Christian, | ) | Chapter 7 |
| | ) | Honorable Charles M. Walker |
| Debtor. | ) | |
| | ) | |
| | ) | |
| Myka Ventures, Inc. d/b/a | ) | |
| UPS Store 6148, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No: 3:18-ap-90169 |
| | ) | |
| Jessica Nicole Christian, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter has been placed before the Court by a creditor's complaint pursuant to 11 U.S.C. §§ 727(a)(4) and (7). The Plaintiff urges the Court to infer the intent of the Debtor to hinder her creditors by the misrepresentation of her income and assets in her schedules, and the Plaintiff presents substantial evidence to establish that inference. In order to overcome the inference, the Debtor/Defendant must provide evidence that sufficiently explains and clarifies the circumstances surrounding the information contained in her schedules as well as her reasoning

1

for providing that information. Her mindset and intentions are at issue, and her testimonial evidence is crucial to her defense.

## JURISDICTION

The Plaintiff objects to the Debtor's discharge pursuant to §§ 727 (a)(4) and (7)[1]. The Court has jurisdiction over this core matter pursuant to 28 U.S.C. § 157(b)(2)(I) and 28 U.S.C. § 1334.

## BACKGROUND[2]

The Debtor, Jessica Christian ("Jessica"), filed a voluntary Chapter 7 petition on June 27, 2018 in the Middle District of Tennessee ("Bankruptcy Case"). Jessica was represented by counsel in the Bankruptcy Case who prepared and signed schedules for her, but as frequently happens in Chapter 7 cases due to the unfortunate economic realities of representing consumer debtors in Chapter 7 cases, bankruptcy counsel's representation expressly excluded representation in dischargeability actions and did not extend to this proceeding. Thus, in the irony of ironies, Jessica is *pro se* in this adversary case which will determine whether she obtains the very relief she sought when she hired bankruptcy counsel.

Jessica's original statements and schedules were filed with her petition in the Bankruptcy Case and did not disclose any affiliation with Turbo Bros or any income received from Turbo Bros. Turbo Bros was an endeavor in which Jessica's then-fiancé, Brian Keith Proctor ("Keith"), built and sold engine turbos ("turbos"). Keith operated Turbo Bros out of the garage

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532. References to the Federal Rules of Bankruptcy Procedure appear as "Rule."

[2] The facts are gleaned from the record, both exhibits and testimony, from the trial held August 29, 2019.

2

of the home he shared with Jessica and her four children, during which most of the time he also worked a regular job outside the home.

The original statements and schedules list her income as $1,259.93 per month (gross) from her employment as a nail technician with Smile Nails & Spa, where she had been employed for three years; $400.00 per month in child support; and $434.00 per month in food stamps. Regarding previous annual income, the original statements and schedules list: $5,462.70 from January 1, 2018 through June 26, 2018; $17,767.00 from January 1, 2017 through December 31, 2017; and $12,794.00 from January 1, 2016 through December 31, 2016.

The Plaintiff alleges that Jessica failed to disclose Keith's income as household income in her schedules, as well as failed to disclose her income from Turbo Bros—income obtained as a partner in Turbo Bros such that she shared in all the profits of the business. This despite the fact that Jessica's income was disclosed as household income in Keith's bankruptcy filing a mere four months prior to Jessica's filing and; therefore, she should have included his income in her later filing.

After the original Complaint was filed, Jessica amended her Schedules I & J; Form 122 and Statement of Financial Affairs (collectively, the "Amended Schedules"). The Amended Schedules increased her income by $56.00 per month and added annual income from Turbo Bros totaling $331.02 within the six months preceding the Petition Date; $984.15 from January 1, 2018 through June 26, 2018; and $64.14 from January 1, 2017 through December 31, 2017.

The Plaintiff points out that at the time of filing, Jessica was co-owner of at least three cars, with a corresponding debt of at least $105,000.00, and resided with Keith in a 4,100 square-foot, five-bedroom home valued at nearly $500,000.00. Jessica's schedules indicate she paid

3

Case 3:18-ap-90169    Doc 30    Filed 01/10/20    Entered 01/10/20 14:45:55    Desc Main
Document      Page 3 of 14

rent of $500.00 for living in the home, while the schedules in Keith's bankruptcy case state that she contributed $1,200.00 towards a combined household income of $7,200.00 per month, with the rent for the residence being $2,100.00 per month. The Plaintiff would further show that neither Jessica or Keith listed any reference to Turbo Bros, nor any revenue received from its operation in their filings.

Jessica's testimony included a description of her involvement with Turbo Bros. She stated that she would ship the turbos Keith constructed at his request. She did this through an account with the Plaintiff to facilitate shipping.[3] The account was set up with her debit card. She also testified that she would assist Keith by setting up marketing of the turbos with social media and internet postings from September 2017 through January 2018, again at his request. During such time, Turbo Bros incurred a debt in excess of $2,500.00 for unpaid shipping costs at Plaintiff's business. The debt was ascribed to Jessica by virtue of her bank card which secured the account.

At some point in 2018, prior to her filing, Jessica and Keith ended their personal relationship, which apparently also terminated Jessica's involvement with anything related to Turbo Bros. Jessica continued to live in the house while awaiting approval of her application for government housing—this constituting the time in which she paid $500 per month to reside in a specified area of the home with her children.

## THE COMPLAINT

The Plaintiff seeks denial of Jessica's discharge pursuant to §§ 727(a)(4)(A) and (a)(7), which provide as follows:

---

[3] The Plaintiff does business as the UPS store from which Jessica would ship the turbos.

4

> **(4)** the debtor knowingly and fraudulently, in or in connection with the case--
>
>> **(A)** made a false oath or account;
>> **(B)** presented or used a false claim;
>> **(C)** gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
>> **(D)** withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;
>
> . . . .
> **(7)** the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider[.]

11 U.S.C. §§ 727(a)(4) & (a)(7) (2019).

At issue is the extent of Jessica's involvement and status in the ownership and operation of Turbo Bros, and the division of household financial responsibilities, such that the information provided in her schedules constitutes a false statement under oath, thereby providing the basis for denial of her discharge.

## THE TRIAL

The Court conducted a trial on August 29, 2019. At the trial, the Plaintiff offered the testimony of its owner, Myroslav Kuzmyn, as well as that of Jessica. Jessica, acting in her *pro se* capacity, gave her direct testimony and called Amanda Leigh Ann Burlison-Marck to testify.[4]

Mr. Kuzmyn testified as to the opening of the account with the Plaintiff, as well as his understanding of Jessica's position in Turbo Bros. He stated that Jessica appeared to be a partner in the business in that he dealt almost primarily with her as far as the shipping of the turbos. He also verified the documents associated with the account, and the fact that the account was

---

[4] This witness' testimony did not add or detract from Jessica's or the Plaintiff's case, nor did it have any impact on the decision of this Court.

secured by Jessica's bank card.  Although the Plaintiff presented evidence of the sale price of the turbos, he did not present anything that indicated Jessica had any knowledge of the operations, costs, or revenues, nor that she had any control over the funds that may have been associated with Turbo Bros.

Jessica's testimony was essentially the most important.  It is Jessica's knowledge and intent that are the crux of the inquiry here. She testified that Turbo Bros was a side job for Keith.  Her description of her involvement appeared to be that of someone running errands for their significant other.  She did not have knowledge of details regarding parts, orders, construction, costs, revenue, etc.  She also did not know how much income Keith drew from the endeavor, if any.

## DISCUSSION

The caselaw and secondary commentary universally agree on certain well-established principles with respect to the purpose of bankruptcy and the place that a bankruptcy discharge has in the process.  As numerous cases have repeated throughout the years, "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 127 S. Ct. 1105, 166 L. Ed. 2d 956 (2007).  To accomplish the goal of a "fresh start," the Bankruptcy Code acts as the guidebook that enables that mythical honest but unfortunate debtor to obtain relief

> ". . . from the weight of oppressive indebtedness, and permit him to start fresh free from the obligations and responsibilities consequent upon business misfortunes." . . . This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor . . . , a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244-45, 54 S. Ct. 695, 699 (1934).

6

Since the discharge is the rock upon which the lofty goal of a fresh start was built, Judge Clive Bare's words more than 35 years ago still hold true with respect to a bankruptcy discharge, "Discharge, the principal objective of a chapter 7 debtor, is a statutory right involving public policy considerations. . . . Discharge 'is refused to a dishonest bankrupt as a punishment for his fraud and to prevent its continuance in the future.'" *In re Moore*, 50 B.R. 661, 664 (Bankr. E.D. Tenn. 1985) quoting *In re Hammerstein*, 189 F. 37 (2d Cir. 1911).

When a creditor/plaintiff seeks to frustrate the discharge by filing an adversary proceeding to deny it, the burden falls squarely on that creditor to prove that "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *See Montedonico v. Beckham* (*In re Beckham*), No. 08-8054, 2009 WL 1726526, at *8 (B.A.P. 6th Cir. June 19, 2009) (quoting *Keeney v. Smith* (*In re Keeney*), 227 F.3d 679, 685 (6th Cir. 2000)).

A debtor only knows that their statement is false when he or she intentionally states information contradicting the truth despite awareness of the truth. *See Ayers v. Babb* (*In re Babb*), 358 B.R. 343, 355 (Bankr. E.D. Tenn. 2006). Further, fraudulent intent is not present when the debtor makes an honest error or omission. *See Keeney*, 227 F.3d at 683.

It is uncontroverted that Jessica failed to disclose any income from Turbo Bros on her original statements and schedules, and the statement was made under oath since the schedules were signed under penalty of perjury. The real issues are whether the debtor knew the statement was false, and whether the debtor made the statement with fraudulent intent.

7

Jessica's Status in Turbo Bros

To employ plain English, Turbo Bros is nothing more than a "side hustle"[5] that Jessica's then-fiancé, Keith launched in 2017, and discovered to be unworkable shortly thereafter. Keith continued to have his side hustle after he and Jessica broke up, as evidenced by the only documents submitted by Jessica in her defense: screenshots of social media postings showing Keith and his new side hustle called RPM Powerstroke, which markets and builds the same items Turbo Bros did when it was a functioning endeavor.

The Plaintiff asserts that Jessica was a partner in Turbo Bros and ran it with Keith, and that she concealed this fact from the Court and her creditors in her filings with the intent to profit from that concealment. The evidence offered to support this is her signature on the credit application and the use of her bank card to secure an account with the store, as well as the impressions of the Plaintiff's owner who testified credibly. However, his credibility is not determinative of Jessica's knowledge and intent. Since there is no direct evidence that names Jessica as a partner in the business, the evidence is that of inference.

The Plaintiff has purported that Jessica was a partner in her former fiancé's business, Turbo Bros. Partnerships are for-profit business organizations of two or more entities, often individuals, the creation, organization, and dissolution of which being governed by state law. *See Pettes v. Yukon*, 912 S.W.2d 709 (Tenn. Ct. App. 1995). A partner relationship is generally the result of a contract either express or implied. *Id.* In determining whether a partnership exists courts look at: (1) intention of the parties, (2) sharing of profits and losses (3) joint

---

[5] Miriam-Webster states that *side hustle* refers to "work performed for income supplementary to one's primary job." *See https://www.merriam-webster.com/words-at-play/words-were-watching-side-hustle.*

administration and control of business operation, (4) capital investment by each partner, and (5) common ownership of property. *Id*.

Although the documents offered by the Plaintiff may appear to infer otherwise, Jessica's credible testimony did not support that inference. Jessica's actions in relation to Turbo Bros were of a personal nature rather than in a professional capacity. In other words, Jessica was acting as a domestic partner, not as a business partner. Her description of how she came to ship items with the Plaintiff and make social media postings at Keith's request was that of a significant-other running errands in support of her personal relationship. Keith had the technical knowledge, built the product, determined the terms of sales, ordered the supplies, and handled the money. Turbo Bros was Keith's side hustle. Jessica was simply helping out as part of her household duties. Her description of her situation and her relationship with Keith was honest and forthcoming and did not support a finding that a business partnership existed between her and Keith, or that she acted in that capacity. *See Wheeler v. Haley*, No. 91-267-I, 1993 WL 398489, at *3 (Tenn. Ct. App. Oct. 1, 1993).

<u>"False Oath" Exception</u>

Under § 727(a)(4)(A), a debtor will be denied a discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account[.]" The "false oath" exception therefore requires that: "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Carter-Jones Lumber Co. v. Beatty (In re Beatty)*, 583 B.R. 128, 138 (Bankr. N.D. Ohio 2018). While complete financial disclosure is a prerequisite to the privilege of bankruptcy discharge, proving "fraudulent intent" is a very high bar. *See, e.g., McDermott v. French (In re French)*, 592 B.R.

9

653 (Bankr. E.D. Mich. 2018) (granting discharge for the debtor); *contra Branch Banking & Trust Co. v. Evans (In re Evans)*, 538 B.R. 268, 287-88 (Bankr. W.D. Va. 2015) (holding debtors in the Fourth Circuit to a higher standard of "willful" false oath necessitating action that are "deliberate, voluntary, conscious and not inadvertent or accidental"). The standard of proof, burdened by the Plaintiff, is that of a preponderance of evidence. *See Keeney*, 227 F.3d at 683.

Denial of discharge does not always require an active effort (i.e., transfer to conceal assets) by the debtor. *See Buckeye Retirement Co. v. Heil (In re Heil)*, 289 B.R. 897 (Bankr. E.D. Tenn. 2003) (holding that the omission of assets and obligation owed to debtor by third-party warranted revocation of discharge); *but see Hunter v. Sowers (In re Sowers)*, 229 B.R. 151 (Bankr. N.D. Ohio 1998) (denying discharge for the debtor's concealment of estate assets). Traditionally, the failure to include an asset or disclose certain income will qualify as a false statement made under oath as necessitated by the first two elements. *See generally Lepre v. Milton (In re Milton)*, 595 B.R. 699 (Bankr. W.D. Pa. 2019) (finding the fulfillment of each element by statements made on debtor's bankruptcy schedules); *but see Gold v. Guttman (In re Guttman)*, 237 B.R. 643, 648 (Bankr. E.D. Mich. 1999) (refusing to deny discharge solely due to the failure by a debtor to include assets in bankruptcy schedules).

This Court finds that the first, second, and fifth prongs of the "false oath" exception are easily met. It is undisputed that here, Jessica failed to disclose any income from Turbo Bros on her original statements and schedules. The statement was made under oath since the schedules were signed under penalty of perjury. Further, the statement related materially to the Bankruptcy Case in that it concerns Jessica's assets. Denial of discharge is therefore only appropriate if the Plaintiff has shown that Jessica had knowledge that her statement was false, *and* she had fraudulent intent when she made the statement. These elements, "knowingly" and

"fraudulently," must be proven separately and may not be conflated. *Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 374 (Bankr. E.D. Tenn. 2009).

Knowledge

A debtor knows their statement is false when he or she "knew the truth, but nonetheless failed to give the information or gave contradicting information." *Babb*, 358 B.R. at 355; *see also Saslow v. Michael* (*In re Michael*), 452 B.R. 908, 919 (Bankr. M.D.N.C. 2011) (using "incompatible with his own knowledge" standard in denying discharge). In *Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*, the Sixth Circuit Bankruptcy Appellate Panel affirmed the finding that the defendants had known a statement was false, because there was inconsistency between defendants' oaths despite clear understanding between defendants in signing their respective affidavits. 559 B.R. 692, 698 (B.A.P. 6th Cir. 2016).

Here, Jessica was aware that she had made money from her affiliation with Turbo Bros but was unaware that it was relevant to her bankruptcy filing. In her mind, the statement on the schedule (the exclusion of income) was not contradictory to the truth—despite having been somehow compensated for her help by Turbo Bros. Therefore, she likely did not knowingly make a false oath as required by the exception.

Fraudulent Intent

Fraud must be actual, rather than constructive, for purposes of fraudulent intent. *Buckeye Retirement Co. v. Hake (In re Hake)*, 387 B.R. 490 (Bankr. N.D. Ohio 2008). The Court determines fraudulent intent as a factual issue based on the "all the facts and circumstances of the case." *Keeney*, 227 F.3d at 686; *accord Eifler v. Wilson & Muir Bank & Trust Co*., 588 F. App'x 473 (6th Cir. 2014). While a pattern of errors or omissions "'may have a cumulative effect

11

Case 3:18-ap-90169    Doc 30    Filed 01/10/20    Entered 01/10/20 14:45:55    Desc Main
Document      Page 11 of 14

giving rise to an inference of an intent to deceive,'" *see Stevenson v. Cutler* (*In re Cutler*), 291 B.R. 718, 726 (Bankr. E.D. Mich. 2003), a single instance (or few minor instances) are generally insufficient for finding fraudulent intent. *See French*, 592 B.R. at 658 (holding that debtor's false statements on statement of financial affairs did not provide basis for denial of discharge as they were innocent mistakes and debtor did not have motivation or intention to lie); *see also Hamilton*, 306 B.R. at 579 (holding that two conflicting statements of debtor were product of misunderstanding and not significant enough to warrant denial of discharge). Courts look for a "pattern of recklessness" through the existence of multiple inaccuracies or falsehoods constituting indifference to truth as evidence of fraudulent intent. *FDIC v. Ligon (In re Ligon)*, 55 B.R. 250 (Bankr. M.D. Tenn. 1985).

Failure to provide credible explanations for errors and omissions will weigh against the defendant. *U.S. Trustee v. Halishak (In re Halishak)*, 337 B.R. 620 (Bankr. N.D. Ohio 2005) (holding that the multitude of omissions made it unlikely that they were due to honest mistake). However, strong mitigating factors include the debtor's lack of understanding bankruptcy matters and ready disclosure when questioned. *Kovacs v. McVay (In re McVay)*, 363 B.R. 824 (Bankr. N.D. Ohio 2006) (finding that the debtor's willingness to acknowledge his mistake rather than conceal it was inconsistent with the intent to defraud). Lay individuals are not expected to understand the intricacies of the bankruptcy process; if it were so simple, attorneys before this Court would find themselves largely out of work. Moreover, denying discharge in consequence for such reasons—thereby preventing the debtor's fresh start—would be a misguided application.

Rather, the purpose of § 727(a)(4)(A) is to prevent costly investigations by the trustee and creditors by ensuring that they are provided with accurate information. *See U.S. Trustee v. Zhang* (*In re Zhang*), 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012). The exemption does not seek to

12

punish an honest omission made by a debtor out of pure ignorance or error. *See In re Oliver*, 414 B.R. at 374 (holding that a false statement "resulting from ignorance or carelessness does not rise to the level of 'knowing and fraudulent'"); *see also Keeney*, 227 F.3d at 686. Often, the fundamental outcome is dependent on the court's assessment of the debtor's credibility. *See McDermott v. Capra (In re Capra)*, No. 16-1010, 2016 WL 5106994, at *7 (Bankr. N.D. Ohio Sept. 19, 2016).

## CONCLUSION

All debtors have an affirmative duty to disclose all assets and to truthfully complete the schedules and statements. But, here, Jessica relied on bankruptcy counsel to prepare the statements and schedules, as do the overwhelming majority of unsophisticated consumer debtors who file Chapter 7, and in that continuing irony of ironies, is now forced to explain the statements and schedules without the assistance of the counsel who prepared them to obtain her discharge.

Given that § 727(a)(4)(A) functions as a defense mechanism, protecting creditors from deceptive practices by debtors' attempts to out-smart the system, the Plaintiff offers that the culmination of circumstances add up to intent. This Court rejects the Plaintiff's argument, which has been made unsuccessfully time and again in this circuit. *See Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896 (Bankr. W.D. Tenn. 2009) (refusing to deny discharge for debtor who failed to list certain assets on bankruptcy schedules, because satisfactory explanation of lost assets proved that omission was inadvertent).

Even if the circumstances give an impression of intent, Jessica's testimony was credible and therefore tips the scale against intent. Because she testified in court, the Plaintiff was

afforded the opportunity to elicit, on cross-examination, any ulterior motive or reason that the omission was more than an authentic error. The Plaintiff failed to do so. Jessica did not put on a performance or any sort of façade to shift the blame for her actions. Nor did she appear to be malicious or acting in a deceitful manner that the provision serves to protect against. Jessica did not hide her error or attempt to evade fault, but instead answered the questions posed to her plainly, readily, and in a thoughtful manner. The Code does not admonish naïve debtors for simple mistakes and this Court will not deviate.

Ultimately, the Plaintiff did not meet his burden regarding the third and fourth elements of the "false oath" exception and thus did not establish a *prima facie* case as to the claim. Nonetheless, the Court, having heard all the evidence presented at trial, is satisfied with the Debtor's explanation and finds the testimony of the Debtor to be credible. Therefore, the Plaintiff's claim pursuant to §§ 727(a)(4)(A) and (a)(7) fails.

Although the Plaintiff did proffer circumstantial evidence of potential fraud, this Court's evaluation and judgment as to the veracity of Jessica's testimony in determining her knowledge and intent when providing information in her filings trumps any circumstantial inference. Jessica's truthfulness was obvious and more than sufficient to overcome any inference given the lofty standard required by this trier of fact to infer her actual false oath. Based on the foregoing, this Court finds no reason to deny the discharge under §§ 727(a)(4)(A) and (a)(7). This Court finds for the Defendant and judgment will be entered accordingly.

This Order has been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.

14

Case 3:18-ap-90169    Doc 30    Filed 01/10/20    Entered 01/10/20 14:45:55    Desc Main
Document      Page 14 of 14